UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 SEP 17 PM 4: 32

CLERK

BY _____PM_____
DEPUTY CLERK

AMY AUDSLEY,                    )
                               )
        Plaintiff,             )
                               )
        v.                     )        Case No. 5:10-cv-208
                               )
RBS CITIZENS, N.A. D/B/A       )
CITIZENS BANK, RADIOSHACK      )
CORPORATION,                   )
AND FREDERICK FARWELL,         )
                               )
        Defendants.            )

**OPINION AND ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**ON COUNT IV OF PLAINTIFF'S AMENDED COMPLAINT**
(Doc. 59)

Presently before the court is the motion for summary judgment (Doc. 59) filed by Defendant RadioShack Corporation ("RadioShack"). RadioShack seeks summary judgment with respect to Count IV of Plaintiff's Amended Complaint, in which Plaintiff alleges a wrongful termination claim against RadioShack under a theory of constructive discharge. Plaintiff opposes the motion.

Plaintiff is represented by Karl C. Anderson, Esq. RadioShack is represented by Andrew H. Maass, Esq.

For the reasons set forth below, RadioShack's motion for summary judgment is hereby GRANTED.

**I.      Undisputed Facts.**

This case arises out of Plaintiff's employment with RadioShack as a store manager in West Lebanon, New Hampshire. RadioShack employed Plaintiff for twenty years.

Defendant Frederick Farwell was the store manager of the West Lebanon RadioShack prior to Plaintiff's employment in that position and previously worked with

Plaintiff. At certain times during Plaintiff's employment, Mr. Farwell and his former employees made statements that Plaintiff describes as "malicious and harmful" which included a note written in 2004, which was of a competitive nature regarding sales, that stated "kill Amy." (Doc. 59-3 at 112.) [1]

In 2007, Plaintiff experienced "incidents of violence and abusive behavior in her work environment" from two former employees of RadioShack, Adam and Bill. (Doc. 59-1 at ¶ 14.) The parties do not further describe what occurred during these incidents. Plaintiff reported the events to RadioShack. Plaintiff fired Adam following his incident without having to seek approval from RadioShack. Bill never returned to work following his incident. After these employees left, Plaintiff experienced no similar incidents from RadioShack employees.

On July 22, 2008, Plaintiff applied for a loan from RBS Citizens Bank ("Citizens") so that she could purchase a coffee shop in West Woodstock, Vermont, where she resides. As part of the loan application process, Plaintiff hand-delivered paperwork to a Citizens bank branch in West Lebanon, where Mr. Farwell then served as branch manager. Mr. Farwell personally took Plaintiff's paperwork to fax it to Citizens' underwriting department. Mr. Farwell inquired about the purpose of the loan, and Plaintiff informed him that she intended to purchase a coffee shop in West Woodstock, Vermont and operate it as an investment property while she continued to work at RadioShack. Plaintiff asked Mr. Farwell to keep this information confidential. In late January 2009, Plaintiff's coffee shop opened for business.

During the third week of January 2009, the new regional manager for RadioShack made an unannounced visit to the West Lebanon store. The regional manager conducted

---

[1] The remaining statements identified by Plaintiff do not appear to be statements made by either Mr. Farwell or his former employees and consist of the district manager questioning her ability to do her job; Mr. Farwell's "bad attitude" towards her; and an email in which her district manager stated that Mr. Farwell knows that Plaintiff is not well and is using that to "emphasize his recommendation." (Doc. 75-2 at 2.)

an inspection of the store and demanded certain changes.[2] Plaintiff cancelled a planned vacation in order to attend to the demands of the regional manager, but rescheduled and took the vacation the following week.

In February 2009, RadioShack's district manager called her about the West Woodstock coffee shop and asked whether it would interfere with her duties as a store manager at RadioShack. Plaintiff informed the district manager that the coffee shop would not interfere with her job, and she explained that she had also owned and operated an inn out of her home for the previous nine years, which had not hindered her ability to work for RadioShack.

On or about February 16, 2009, Plaintiff learned that the regional manager was interviewing Mr. Farwell at a McDonald's restaurant in West Lebanon. The district manager told Plaintiff that he had advised Mr. Farwell that there were no job openings in the West Lebanon store. He noted that Mr. Farwell had made negative comments about Plaintiff which he refused to repeat. The district manager told Plaintiff that, although Mr. Farwell was looking to come back to RadioShack, it would not happen because he was asking for too much money.

On March 13, 2009, Plaintiff requested, and RadioShack granted, leave pursuant to the Family and Medical Leave Act ("FMLA") to attend to an injury of her right arm. Immediately following Plaintiff's leave, the district manager communicated with Mark Ploof, the manager of another RadioShack store, regarding Mr. Farwell's interest in a position with RadioShack. The district manager told Mr. Ploof that he did not like Mr. Farwell's attitude toward Plaintiff.

---

[2] These changes and demands consisted of sweeping the de-icing salt and dirt from the walkway in front of the store; requiring Plaintiff to get down on her hands and knees and look for salt under certain fixtures in the store that had merchandise on them; washing the exterior store windows despite freezing temperatures; mopping a square of tile near the entrance every ten minutes during store hours; and cleaning the entire store with Armoral.

On May 15, 2009, Plaintiff's attorney contacted RadioShack regarding temporary disability. In this letter, Plaintiff's attorney stated that Plaintiff's psychologist had not approved her return to work; however, she planned to return part-time following her FMLA leave.[3]  Additionally, the letter stated that Plaintiff "does not feel that her mental health would withstand daily exposure to [Mr. Farwell]," and that because he had been hired as the assistant manager at her store "she does not feel that she is up to [the] task" of returning to work. (Doc. 75-3 at 2.) RadioShack sent an email to Plaintiff's attorney on June 25, 2009, stating that Plaintiff could still return to her position as a store manager of the West Lebanon RadioShack, but Mr. Farwell would be her assistant manager until RadioShack could find him his own store. On July 31, 2009, RadioShack advised Plaintiff's attorney that a new district manager "will be addressing the environmental issues for which Amy is concerned (Fred working at her store)." (Doc. 75-5 at 2.) This email also asserted that, as of July 31, 2009, Plaintiff would still be manager of the West Lebanon store upon her return; however, RadioShack could not continue to keep her position available much longer.

Plaintiff never advised RadioShack that she was able or ready to return to work. Plaintiff eventually applied for and received long-term disability. In order to receive long-term disability, Plaintiff certified that she was not capable of performing her job as a store manager for RadioShack. Plaintiff's last day as a paid employee of RadioShack was May 7, 2010. However, she had not returned to work at the West Lebanon RadioShack since her initial leave in March 2009. Mr. Farwell was not an employee of RadioShack on the last day that Plaintiff worked in the West Lebanon store. RadioShack hired him while Plaintiff was on leave.

## II.   Disputed Facts.

Plaintiff contends that RadioShack inadequately responded to her request for support and assistance when she reported Adam's and Bill's violence and abusive

---

[3] It is not clear how Plaintiff's FMLA leave for a right arm injury transformed into FMLA leave for mental health reasons. As RadioShack does not contest the basis for Plaintiff's continued FMLA leave, the court does not address the issue further.

behaviors in the workplace. She does not explain how RadioShack should have responded and how these 2007 incidents gave rise to her decision not to return to work in 2009.

Plaintiff also disputes RadioShack's description of the regional manager's inspection of the West Lebanon store. Plaintiff contends that it was a humiliating "white glove test" (Doc. 59-2 at 29) in which the regional manager made "unreasonable demands" (Doc. 59 at 6) in the presence of customers, other RadioShack employees, and the regional manager's husband. Plaintiff further claims that other RadioShack store managers did not receive similar visits, and the frequency of the regional manager's store visits and the manner in which they were conducted support a conclusion that Plaintiff was singled out for special adverse attention. Plaintiff concedes that the regional manager only visited the store twice and only one of those occasions involved a "white glove test." She further concedes that the regional manager had an abrupt and direct management style, which she employed with everyone, that she never made any personally derogatory comments to or about Plaintiff, and that all of the store managers in the region felt "threatened" by the regional manager. (Doc.59-2 at 38.)

With respect to Plaintiff's last day as a paid employee with RadioShack on May 7, 2010, Plaintiff claims that she had a reasonable expectation, confirmed by emails from RadioShack's counsel, that she would be able to return to work when she recovered from her disabling condition. She thus disputes RadioShack's reliance on her certification that she could not return to work.

Finally, Plaintiff testified that she believes Mr. Farwell disclosed to the district manager the confidential information that she was opening a coffee shop, which he had obtained from Plaintiff's loan application.[4] She also contends the district manager discussed her ability to perform her duties at RadioShack while operating her coffee shop with other RadioShack employees. As RadioShack points out, Plaintiff did not depose

---

[4] In her deposition, Plaintiff testified that in February 2009, she confronted her district manager with a report that he was interviewing Mr. Farwell. In response, he said: "[W]ell, okay, so now that you know that Fred's being interviewed, you might as well know that it was Fred that told me about the coffee shop, and he also asked for your job." (Doc. 59-3 at 53.)

Mr. Farwell or any of the individuals in question or obtain affidavits from them. It thus contends that her testimony regarding these events relies at least in part upon her own unsupported speculation rather than upon any direct evidence from the participants involved. It also contends there is no evidence that RadioShack knew that Mr. Farwell had obtained the coffee shop information by improper means.

## III.  Conclusions of Law and Analysis.

The court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) and is thus required to apply state law to the substantive issues. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Woodstock Resort Corp. v. Scottsdale Ins. Co.*, 927 F. Supp. 149, 153 (D. Vt. 1996). Both parties rely on New Hampshire law in briefing the issues for summary judgment. Without deciding the choice of law issue, for purposes of adjudicating the pending motion, the court also applies New Hampshire law.

### A.  Standard of Review.

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and deny the motion if a rational juror could decide in favor of the nonmoving party under the applicable law. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993).

To avoid summary judgment, the nonmoving party must offer more than "mere speculation and conjecture." *Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 248.

With respect to an issue on which the nonmoving party bears the burden of proof at trial, the party moving for summary judgment is not required to "produce evidence showing the absence of a genuine issue of material fact," but "[i]nstead . . . the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  On such issues, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).

In this case, although RadioShack acknowledges that there are disputed issues of fact, it contends that the court can nonetheless decide the pending motion for summary judgment as a matter of law because no rational jury could find in Plaintiff's favor even if the jury fully credits Plaintiff's version of the disputed facts.

**B.    Whether Plaintiff Was Wrongfully Terminated by RadioShack.**

Plaintiff's sole claim against RadioShack is for wrongful termination under a theory of constructive discharge.  Under New Hampshire law, a claim for wrongful termination contains two elements: "(1) the termination of employment was motivated by bad faith, retaliation or malice; and (2) that [the plaintiff] was terminated for performing an act that public policy would encourage or for refusing to do something that public policy would condemn."  *Karch v. BayBank FSB*, 794 A.2d 763, 774 (N.H. 2002).  A plaintiff may demonstrate termination by proof of constructive discharge.  *Id.*

**1.    Whether RadioShack Constructively Discharged Plaintiff.**

Plaintiff concedes that RadioShack did not terminate her employment and that it was her decision not to return to her employment there in May 2010.  She nonetheless contends that she was constructively discharged because she was forced to endure intolerable working conditions at RadioShack consisting of the following incidents: (1) RadioShack's failure to take adequate steps to support and protect Plaintiff in dealing

7

with abusive and violent employees; (2) the unreasonable pressure placed on Plaintiff by the new regional manager; (3) RadioShack's receipt of the confidential loan information regarding Plaintiff's purchase of a coffee shop and use of it to challenge Plaintiff's ability to competently perform her job; (4) RadioShack's decision to interview Mr. Farwell, hire him as the assistant manager of the West Lebanon store, promote him to manager at another store, and permit him to manage the West Lebanon store and remain there temporarily after Plaintiff's anticipated return.

RadioShack argues that the identified incidents are either unproven and speculative, took place during Plaintiff's leave and thus are not working conditions that Plaintiff endured, or are so dated and trivial that they could not conceivably give rise to a constructive discharge many months or even years after their occurrence.

Under New Hampshire law, "[a] plaintiff need not prove that he was expressly fired; the termination can also be a constructive discharge[.]" *Huard v. Town of Allenstown*, 2011 WL 540766, at *3 (D.N.H. Feb. 8, 2011) (citation and internal quotation marks omitted). "Constructive discharge occurs when an employer renders an employee's working conditions so difficult and intolerable that a reasonable person would feel forced to resign." *Karch*, 794 A.2d at 774 (citation and internal quotation marks omitted). Relatively minor abuses do not rise to the level of constructive discharge, "[r]ather, the adverse working conditions must generally be ongoing, repetitive, pervasive, and severe." *Porter v. City of Manchester*, 849 A.2d 103, 117 (N.H. 2004) (citation and internal quotation marks omitted). The standard for evaluating constructive discharge is objective, and "it cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held." *Slater v. Town of Exeter*, 2009 WL 737112, at *6 (D.N.H. Mar. 20, 2009) (citations and internal quotation marks omitted).

RadioShack contends that the cited incidents independently and collectively cannot, as a matter of law, give rise to a constructive discharge claim. As a threshold matter, it points out that it never threatened to terminate Plaintiff's employment, which is

8

a common factor in constructive discharge claims,[5] but instead repeatedly assured Plaintiff that her position would remain available for her if she decided to return to work.[6] It also observes that it was Plaintiff who advised RadioShack that she was no longer capable of working there in order to obtain disability payments.

RadioShack further points out that the incidents with the employees who created an abusive and violent work environment occurred in 2007, and Plaintiff's last paid day of work was May 7, 2010.  During the intervening time period, the incidents were not repeated and the employees who caused the incidents were no longer employed at RadioShack.  Plaintiff was thus not forced to endure working with them further.  Against this backdrop, RadioShack contends that no rational juror could find that the incidents were "ongoing, repetitive, pervasive, and severe." *Porter*, 849 A.2d at 117.

The significant lapse of time between the 2007 incidents and Plaintiff's claimed constructive discharge further support a conclusion that those incidents do not provide a factual basis for Plaintiff's constructive discharge.  Although the New Hampshire Supreme Court has not addressed temporal proximity in determining whether a particular event may give rise to an employee's later constructive discharge, this question has been addressed in the context of constructive discharge under Title VII.[7]  Under Title VII, "if [plaintiff] did not leave [employer] within a reasonable time after last being the subject of discrimination, she cannot prevail under a constructive discharge theory." *Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991) (finding time period of six months

---

[5] *See, e.g., Porter*, 849 A.2d at 109-12 (finding evidence supported constructive discharge when, among other things, supervisor threatened to fire plaintiff and told plaintiff "[w]e'll see how long you last.").

[6] *See Slater*, 2009 WL 737112, at *7 ("No reasonable employee could think termination was imminent based on statements from her supervisor expressing an intent that she continue working there.").

[7] The standard for constructive discharge under Title VII is similar to the standard under New Hampshire law, requiring "working conditions so intolerable [] that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities." *Landrau-Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 613 (1st Cir. 2000) (citations and internal quotation marks omitted).

between discriminatory acts and resignation "too great to support [plaintiff's] constructive discharge claim."); *see also Sefiane v. Wal-Mart Stores, Inc.*, 2002 WL 484664, at *6 (D.N.H. Mar. 27, 2002) (finding that plaintiff resigned approximately one year following harassment, the court concluded that "resignation occurred too late after the offensive conduct had ended to be considered a constructive discharge."). The 2007 incidents are thus too attenuated to support Plaintiff's claim of constructive discharge in 2009 or 2010.

Plaintiff's reliance on the allegedly unreasonable demands of the regional manager for her constructive discharge claims presents some of the same challenges. The "white glove test" exposed Plaintiff to the new regional manager's abrupt and demanding manner which was recognized by Plaintiff and her RadioShack colleagues as the regional manager's general management style. Her demands and concerns were not directed towards Plaintiff personally, but related to the cleanliness and appearance of Plaintiff's store. Although Plaintiff was exposed to arguably unpleasant conduct in front of others, she does not contend that the regional manager made derogatory comments to or about her. The events in question occurred in the course of two days, separated by an intervening time period, and were not repeated. Only one of the visits involved the alleged "white glove test." It would thus be difficult, if not impossible, for a rational juror to conclude that the regional manager placed demands on Plaintiff that were "ongoing, repetitive, pervasive, and severe." *Porter*, 849 A.2d at 117. Plaintiff nonetheless urges the court to find that the limited visits could give rise to constructive discharge because they were indicative of what Plaintiff could expect in terms of continued treatment were both she and the regional manager to remain employed at RadioShack. *See Lacasse v. Spaulding Youth Ctr.*, 910 A.2d 1262, 1265-66 (N.H. 2006) (explaining that in certain circumstances a reasonable jury may conclude that "the relatively short period of mistreatment was only the beginning of a campaign of abuse that would continue until she quit."). The problem with this argument is that Plaintiff never cited the demands of the new regional manager as giving rise to her inability to return to RadioShack. Instead, she placed the blame squarely on Mr. Farwell, stating she

did not feel "her mental health would withstand daily exposure to [Mr. Farwell]," and that because he had been hired as an assistant manager at her store "she does not feel that she is up to [the] task" of returning to work. (Doc. 75-3 at 2.) Accordingly, there appears to be no causal connection between the demands of the regional manager and Plaintiff's constructive discharge.[8]

The crux of Plaintiff's constructive discharge claim is that RadioShack forced her to work with Mr. Farwell after he had used her confidential loan information to encourage RadioShack to challenge her competency to manage the West Lebanon store and to ask for her job. As Plaintiff points out, RadioShack was aware Mr. Farwell had a "bad attitude" towards her and had made negative statements about her. If she returned to work at RadioShack, she would have been forced to work with Mr. Farwell at the West Lebanon store until RadioShack found him his own store.

RadioShack counters that Plaintiff cannot claim that she was constructively discharged due to Mr. Farwell's presence in her store because she left RadioShack before Mr. Farwell was rehired. *See Slater*, 2009 WL 737112, at *8 (finding no constructive discharge where plaintiff did not stay long enough to experience her boss "put those words into action[.]"). It notes that Plaintiff's contention that Mr. Farwell leaked her confidential loan information remains speculative and that Plaintiff's strategic decision not to depose either Mr. Farwell or any other RadioShack employee to whom the information was disclosed leaves a gap in the evidence that cannot be rectified by mere allegations. In any event, even if Mr. Farwell advised RadioShack that Plaintiff planned to open a coffee shop in Vermont, this information was true and in no way defamatory, and was not used to negatively impact Plaintiff's employment. There is also no evidence that RadioShack knew the information had been improperly acquired. RadioShack contends that no rational juror could find that by virtue of Mr. Farwell's mere presence in the West Lebanon store, Plaintiff was forced to endure working conditions so "difficult

---

[8] The court nonetheless considers the regional manager's demands as part of the totality of the circumstances.

11

and intolerable that a reasonable person would feel forced to resign." *Karch*, 794 A.2d at 774.

The court agrees that even when the evidence is viewed collectively, and in the light most favorable to Plaintiff, it arguably does not establish intolerable working conditions that were "ongoing, repetitive, pervasive, and severe." *Porter*, 849 A.2d at 117. It is thus doubtful whether a rational jury could decide the constructive discharge element of Plaintiff's wrongful termination claim in her favor. The court, however, need not decide this issue as a matter of law because it is clear that Plaintiff cannot establish the remaining elements of her claim.

> **2.      Whether Plaintiff's Alleged Constructive Discharge Was Motivated by Bad Faith, Retaliation, or Malice.**

A plaintiff must do more than identify a triable issue of fact as to whether he or she has been constructively discharged. Under New Hampshire law, a plaintiff must further show that "the employer's actions, which render working conditions so difficult and intolerable that a reasonable person would feel forced to resign, [were] motivated by bad faith, retaliation or malice." *Karch*, 794 A.2d at 774-75; *see also Scannell v. Sears Roebuck and Co.*, 2006 WL 2570601, at *2 (D.N.H. Sept. 6, 2006) ("[P]roperly alleging constructive discharge satisfies the termination component of a wrongful discharge claim as long as the employer's actions leading to a constructive discharge were motivated by bad faith, retaliation, or malice.") (citation and internal quotation marks omitted).

Plaintiff claims that RadioShack acted in bad faith when it allegedly accepted Plaintiff's confidential loan information from Mr. Farwell; hired Mr. Farwell after his allegedly improper disclosure of the information; and required Plaintiff to work with Mr. Farwell, at least temporarily, if she wanted to return to the West Lebanon store. Plaintiff concedes she did not face direct disciplinary action or threat of termination as a result of the disclosed information, but contends the questioning from her district manager

supports a conclusion that the information was used in bad faith to challenge her loyalty and dedication to RadioShack. [9]

In *Monge v. Beebe Rubber Co.*, 316 A.2d 549, 552 (N.H. 1974), the New Hampshire Supreme Court concluded an employer was motivated by malice when an employee was terminated after, among other things, rebuffing romantic overtures from her foreman. Here, in contrast, Plaintiff presents no evidence that RadioShack's decision to re-hire Mr. Farwell was in any way connected to Plaintiff or was in any way motivated by a desire to harass, punish, annoy, or inconvenience her. Instead, Plaintiff was assured that she would have to work with Mr. Farwell only on a temporary basis until RadioShack found him his own store. While RadioShack's decision to have these two individuals work together even temporarily may have been ill-advised and callous, without more, it does not meet "the legal burden of establishing malice, bad faith, or retaliation." *Dickerson v. Phillips*, 2008 WL 7414631 (N.H. Super. July 16, 2008) (failing to find malice when defendant fired plaintiff by mail, knowing she was hospitalized at the time for suicidal ideation); *see also Costa Precision Mfg. Corp. v. Farris*, 2007 WL 1558577, at *2, 4 (D.N.H. May 29, 2007) (not finding "'constructive discharge' was 'wrongful' in any legally redressable sense[,]" where supervisor told plaintiff that, among other things, he "would not want to have [the supervisor] as an enemy" and "he should consider his family and the possibility that he might 'lose everything'" when making decisions).

Moreover, even if the court fully credits Plaintiff's testimony that RadioShack acquired information regarding Plaintiff's coffee shop from Mr. Farwell, there is no evidence that RadioShack knew that this truthful and ultimately public information had

---

[9] The New Hampshire Supreme Court has found bad faith when an employee is disciplined, terminated, or threatened with termination in response to conduct that would not otherwise warrant discipline. *See, e.g., Karch*, 794 A.2d at 775 (finding bad faith where plaintiff alleged that she was subjected to disciplinary action and threats of termination after requesting an apology from her employer for invading her privacy by listening to a private telephone conversation that occurred after work). Plaintiff cites no authority for finding bad faith where an employer legitimately questions an employee's competency to perform required tasks.

been improperly acquired.  It was thus objectively reasonable for RadioShack to use the information to question Plaintiff's ability to own and presumably have some involvement in the operations of a coffee shop in Vermont in light of the demands of her full-time employment in New Hampshire.

In summary, because Plaintiff presents no evidence that RadioShack's actions were "motivated by bad faith, retaliation or malice," *Karch*, 794 A.2d at 774-75, she has failed to establish an essential element of her wrongful termination claim.  On this basis alone, summary judgment in RadioShack's favor is required.  *See Catrett*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  Plaintiff's inability to establish that her alleged constructive discharge also violated public policy further underscores that conclusion.

### 3.    Whether Plaintiff's Alleged Constructive Discharge Violated Public Policy.

Plaintiff's claim for wrongful termination requires her to show that her discharge arose "because [she] performed acts which public policy would encourage or because [she] refused to perform acts which public policy would condemn." *Wenners v. Great State Beverages, Inc.*, 663 A.2d 623, 625 (N.H. 1995) (quoting *Short v. School Admin. Unit No. 16*, 612 A.2d 364, 370 (N.H. 1992)) (internal quotation marks omitted).  "The public policy prong of a wrongful termination claim 'pertains to the *employee's* action,' not the *employer's*." *Melvin v. NextEra Energy Seabrook, LLC*, 2010 WL 99095, at *2 (D.N.H. Jan. 6, 2010) (citation omitted) (finding that an allegedly groundless firing was an action taken by the employer, and, therefore, cannot satisfy the public policy element of an employee's wrongful discharge claim).

"Public policy" is often "broadly" defined as the "principles and standards regarded by the legislature or by the courts as being of fundamental concern to the state

and the whole of society." *Black's Law Dictionary* at 1351 (9th ed. 2009).  In New Hampshire,

> "the declaration of public policy with reference to a given subject is regarded as a matter primarily for legislative action, and although judicial power undoubtedly exists to declare public policy unsupported by legislative announcement of it[,] the policy must be based on a thoroughly developed, definite, persistent and united state of the public mind.  There must be no substantial doubt about it."

*Welzenbach v. Powers*, 660 A.2d 1133, 1135 (N.H. 1995) (quoting *Welch v. Frisbie Mem'l Hosp.*, 9 A.2d 761, 763-64 (1939)); *see also W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983) (observing that public policy "is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'") (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)).

The New Hampshire Supreme Court has found that public policy "calls for the type of multifaceted balancing process that is properly left to the jury in most instances." *Cloutier v. Great Atl. & Pac. Tea Co., Inc.*, 436 A.2d 1140, 1145 (N.H. 1981).  However, in certain cases, "public policy could conceivably be so clear as to be established or not established as a matter of law[.]"  *Id.*; *see also Short*, 612 A.2d at 370-71 (plaintiff failed to "articulate a violated public policy," and, therefore, the "issue should have been taken from the jury and decided in the [defendant's] favor by the court."); *Mellitt v. Schrafft Candy Co.*, 1981 WL 27284, at *3 (D.N.H. Dec. 21, 1981) ("Where it is clear that plaintiff cannot articulate an expression of public policy as a matter of law, there is no fact question for the jury to decide.").

Plaintiff identifies two events as presenting issues of public policy: (1) RadioShack's willingness to employ Mr. Farwell after he allegedly disclosed Plaintiff's confidential loan information; and (2) RadioShack imposing unreasonable pressure on Plaintiff through the new regional manager.  With regard to the first event, as previously noted, Plaintiff's claim of a connection between the disclosure of her confidential loan information and Mr. Farwell's hiring rests solely on speculation, not evidence, because

15

there is no evidence that RadioShack knew that the coffee shop information had been improperly acquired or hired Mr. Farwell in response to it. *See Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) ("[C]onclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion."). At best, Plaintiff has shown that RadioShack was willing to re-hire Mr. Farwell to work with Plaintiff even though it knew he had used information regarding her plans for a coffee shop and made negative statements about her in an effort to obtain Plaintiff's job. Plaintiff cites no public policy that was violated by these events.

Correspondingly, the "white glove" inspection and the regional manager's demands, at best, implicate a private business policy, not a "public policy" which must be protected by the courts. *See Bourque v. Town of Bow*, 736 F. Supp. 398, 402 (D.N.H. 1990) (concluding that summary judgment was properly granted with regard to wrongful termination claim because employer's decision to fire plaintiff and retain his supervisor, rather than further investigating plaintiff's allegations regarding his supervisor's misconduct, was "an internal, not public, policy."). Public policy thus offers Plaintiff no protection from a management decision with which she disagrees. *See Short*, 612 A.2d at 370 (explaining that public policy does not protect an employee's "expression of disagreement with a management decision[.]").

Plaintiff also does not establish that she refused to take an action, requested by RadioShack, that public policy would condemn. Her refusal to work with Mr. Farwell and her objection to the "white glove" inspection do not appear to implicate rights recognized and protected by the New Hampshire Legislature or the New Hampshire courts. *See, e.g., McDill v. Environamics Corp.*, 757 A.2d 162, 166 (N.H. 2000) (citing "discrimination or retaliatory discharge" as examples of "terminations that violate public policy"); *Karch*, 794 A.2d at 775 (finding a "public policy favoring the good faith reporting of reasonably perceived illegal actions of employers by employees without retaliation"); *Cloutier*, 436 A.2d at 1145 (concluding that by "enforce[ing] the OSHA directive by not forcing those in charge in his absence to imperil themselves by making deposits[,]" plaintiff was terminated for furthering a public policy); *see also Meuser v.*

16

*Fed. Express Corp.*, 564 F.3d 507, 521 (1st Cir. 2009) (interpreting Massachusetts law, and explaining that public policy component of a wrongful termination claim means "[r]edress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury).") (quoting *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 145 (1st Cir. 1998)).

Because Plaintiff has failed to present any evidence that her alleged constructive discharge arose because of actions that public policy would encourage or her refusal to take actions that public policy would condemn, she has failed to establish an essential element of her wrongful termination claim.  Summary judgment is therefore required. *Catrett*, 477 U.S. at 322.

## CONCLUSION

For the reasons stated above, the court GRANTS RadioShack's motion for summary judgment on Count IV of Plaintiff's Amended Complaint.  (Doc. 59.) SO ORDERED.

Dated at Rutland, in the District of Vermont, this / 7 day of September, 2012.

Christina Reiss, Chief Judge
United States District Court